IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| KISHA PETERS,<br>　　　　*Plaintiff*,<br><br>v.<br><br>BANNER HEALTH d/b/a BHT<br>BANNER HEALTH OF TEXAS,<br>　　　　*Defendant*. | §§§§§§§§§ CIVIL ACTION NO. <u>4:24-cv-772</u><br>ECF<br>Jury Demand |

### PLAINTIFF KISHA PETERS' ORIGINAL COMPLAINT AND JURY DEMAND

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Peters sues Banner Health for race discrimination and retaliation under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Banner Health subjected Peters to discrimination and a hostile work environment because of race. Banner Health then fired Peters when she complained of that discrimination.

### I. PARTIES

1. Plaintiff, Kisha Peters, is a resident of Houston, Texas, which is located in Harris County.

2. Defendant, Banner Health, d/b/a BHT Banner Health of Texas, is an Arizona limited liability company with its principal place of business in Arizona, Texas. Defendant does business in the state of Texas and can be served through its registered agent for process, C T Corporation System at 1999 Bryan St., Ste. 900 Dallas, TX, 75201-3136.

### II. JURISDICTION AND VENUE

3. This Court has jurisdiction to hear the merits of Plaintiff's claims under 28 U.S.C. §§ 1331 and 1343(a)(4), as well as 42 U.S.C. § 1981.

4. Venue is appropriate pursuant to 28 U.S. Code § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in Harris County.

## III. FACTUAL BACKGROUND

5. Kisha Peters, African American, first began working for Banner Health on or about August 29, 2016.

6. Peters had no disciplinary history, and excellent performance.

7. Prior to Banner Health's termination of Peters, she held the position of an Associate Director of Coding.

8. Everything changed when Peters gained a new Supervisor on August 8, 2021, and she had to report to Tabbitha Fagin (Caucasian).

9. Shortly after, Peters began to experience racially inappropriate behavior from her manager, Fagin (Caucasian).

10. Fagin used her supervisory position to single out Peters and target her as she was the only African American Associate Director in Coding.

11. During team meetings, Fagin would call out Peters publicly, marginalizing and belittling her contribution to the team.

12. Despite these being team meetings, Fagin began to call on Peters more than anyone else on the team.

13. When Peters would make suggestions, Fagin would completely dismiss Peters' ideas. However, when the recommendations or suggestions came from Peters' Caucasian counterparts, Fagin would praise their contributions and efforts.

14. Specifically, Fagin held Peters to a higher work standard by requiring more from her than her Caucasian cohorts, by micromanaging her work products.

15. Peters made every attempt to reason with Fagin and bring up her concerns with how she has been treated since Fagin was promoted.

16. Fagin did not listen to Peters' concerns and dismissed her complaints entirely, by saying, upon knowledge and belief, "that's just how I manage," suggesting for Peters to just get over it.

17. Peters continued to face racial discrimination, internal targeting, malice, and marginalization from Fagin.

18. In an attempt to rectify the situation, Peters, took her complaints of racial discrimination against Fagin, to her second-line supervisor, Susanne Gleason, in late-September 2021.

19. Peters told Gleason about the continued racial discrimination she faced within the organization, although Gleason dismissed her complaints and refused to investigate further.

20. The discriminatory treatment was so obvious that even another employee, Cindy Bowers (Caucasian), recognized this disparate treatment, prompting her to make her own complaint to Gleason in September 2021 regarding what she observed of Fagin's treatment of Peters.

21. Shortly after, on October 13, 2021, Fagin used her position to further isolate, marginalize and retaliate against Peters, through racially charged motives, and her employment with Banner Health, through a Documented Verbal Discussion-Corrective Action (to expire on April 13, 2022).

22. Through this Disciplinary Action, Fagin attacked Peters' work behavior and work conduct, by simply making up vague issues where they would not have been alleged as issues if Peters were Caucasian, and if she had not filed a complaint against Fagin.

23. Again, Peters immediately began to defend herself by formally reporting the matter to HR Generalist, Jo-Marie Garber.

24. Peters attempted to write a rebuttal to the false retaliatory accusations Fagin wrote in the Documented Verbal Discussion.

25. During the phone call with Garber, Peters was told that she could not submit a rebuttal to the corrective action, but that she would just have to be okay with it.

26. This is another example of Banner Health allowing their management to racially discriminate and retaliate against their employees without any repercussions.

27. Throughout the next several months, Fagin ramped up her racially discriminatory and retaliatory behavior towards Peters.

28. Sometime around November/December 2021, Peters was late to log onto a Teams Meeting involving Fagin, Sherri Carter, and Janet Butler. When she arrived, she overheard Carter and Fagin speaking candidly about, "where monkeys came from" that "she was a monkey," and that "they should send the monkeys back to where they came from," coupled with childish laughing. As soon as they learned Peters was present, the conversation went completely silent.

29. Peters clearly understood the absurd insinuation of the racially discriminatory topic being discussed. Peters reported this incident to Gleason who again dismissed her complaints and concerns.

30. In December 2021, Peters was on a leadership call with several other Associate Directors in Coding along with Fagin.

31. As they discussed aspects of their jobs, Fagin went around the room and asked everyone if they had anything to contribute to the meeting.

32. Each person in the leadership team stated they did not have anything to add at the moment, including Peters.

33. Although when it was Peters' turn to say she did not have anything to add for the meeting, Fagin announced aggressively and rudely, "Kisha is not a team player."

34. Fagin targeted Peters during the leadership call and chose to publicly humiliate and retaliate against her, while dividing her from the rest of the team, as Peters was the only African American Associate Director of Coding and the only one singled out.

35. Peters again sought help from Gleason by reporting the incident of racial discrimination and retaliation.

36. This time, Bowers, another Associate Director in Coding, again reached out to Gleason to report Fagin's abusive and unprofessional behavior towards Peters.

37. Again, Gleason, did not take these reports of racial discrimination and retaliation seriously and refused to investigate them further.

38. Gleason even went as far as to stop responding to Peters' complaints.

39. On February 14, 2022, Peters reached out to Garber again to report Fagin for her public humiliation, unprofessionalism, racial discrimination, and retaliation towards her.

40. Garber told Peters that she would do a follow-up on the above incidents and get back with Peters at a later date. Ms. Garber never followed through with her investigations.

41. Peters continued to face racial discrimination and retaliation from Fagin.

42. In March 2022, Peters began to be targeted by other Banner Health employees and faced false accusations regarding her character, further isolating her within the company.

43. On March 23, 2022, Peters received a message from an educator, Donita Lukich (Caucasian), regarding an apprentice that Peters hired, Rhonda Myrick (African American)

44. Lukich was concerned that Myrick was not progressing as an apprentice, and Peters invited Lukich to join her scheduled one-on-one with Myrick, giving Lukich and opportunity to address her concerns.

45. During the meeting, Lukich began telling Myrick incorrect information about the apprentice program, prompting Peters to step in and correct the topics.

46. The meeting went on as usual and ended with Myrick understanding that she had areas where she needed to improve in order to be successful in the apprenticeship.

47. When the meeting was over, Peters and Lukich went on, business as usual without issue.

48. However, on March 25, 2022, Peters was told to join an impromptu meeting with Fagin and Lukich's supervisor, Linda Gillam (Caucasian).

49. Peters was not informed on what the surprise meeting was about. And, suddenly, Fagin began by asking Peters about the policies and procedures regarding the apprentice program.

50. Peters was extremely confused and bewildered and requested to know why she was being questioned in a meeting.

51. Fagin and Gillam continued to inform Peters that she needed to be re-educated on the apprentice program, because Lukich accused Peters of threatening Myrich's position during that March 23, 2021, meeting.

52. Peters advised she did not threaten Myrich. Yet, without investigating, Fagin and Gillam placed the blame on Peters, and forced her through a re-education program.

53. It had been Lukich (Caucasian) that was providing incorrect information to Myrich (African American). If it had gone uncorrected by Peters, Lukich's incorrect information would have set Myrich up for failure within the program.

54. On information and belief, neither senior leader met with Myrick (African American) before deciding that Lukich's allegation was true or false.

55. This was only another ruse by Fagin, to retaliate against and target Peters, in order to racially divide the team against her.

56. Peters again reported the racial discrimination and retaliation she faced by Fagin to Gleason who did not investigate or attempt to provide an equally fair resolution.

57. It is clear that Gleason did not take Peters' complaint seriously, already dismissing Peters' observations, by saying, "*I don't think its racism*, but I'll do an investigation."

58. Gleason had already come to her conclusion without the benefit of the investigation.

59. On or about April 5, 2022, Gleason met with Myrick where she learned that the allegation from the education team (Lukich) was in fact false.

60. Peters' employment with Banner Health continued to be filled with racial discrimination and retaliation for her reports against Fagin.

61. On May 10, 2022, Peters was leading a meeting with her team. Fagin was in attendance and was disruptive to Peters' leadership over her team. Fagin belittled and embarrassed Peters by interrupting her, intentionally undermining Peters' role as a leader.

62. By way of example, Peters made an unintentional misstatement of not meeting goal, but before she was able to correct herself, in a hostile, unprofessional, and aggressive manner, Fagin began ranting, "Kisha, we met our goal!" Fagin's outburst was so hostile everyone fell silent.

63. This further marginalized Peters at Banner Health, through racial discrimination and retaliation.

64. Peters again reported Fagin's behavior to Gleason, who did not try to rectify the issues.

65. Unknown to Peters someone had falsely made a complaint against Peters claiming she had been the aggressor. Suddenly, Banner was investigating Peters looking for any information it could attempt to use against her.

66. Garber claimed to have interviewed all of the witnesses (participants) present during the May 10 incident, and claimed that all said Peters was the aggressor. However, around late May 2022, during Peters' one-on-one's with her direct reports, employees were bringing up the interviews or contacts from Garber. Without provocation, employees volunteered information, during which Peters learned that not everyone was interviewed, and some that were interviewed were never even asked about the May 10 incident.

67. Employees mentioned it because they were upset about how Peters had been mistreated by Fagin during the call. Garber had no intention of seeking the truth and conducting an honest investigation.

68. Then, on June 23, 2022, Fagin presented Peters with a Written Corrective Action for Behavior-Conduct Inconsistent with Banner Values.

69. Gleason had approved this written corrective action that: (1) contained and uphold the prior allegation made by Lukich despite having learned its falsity; (2) falsely accused Peters of being the aggressor during the May 10 call, despite deliberately not questioning witnesses to the incident; and (3) falsely alleged that Peters was aggressive toward Delia Siebenhausen (Caucasian) during a June 15, 2022 leadership meeting, while rejecting Bowers account that Siebenhausen had been the aggressor – Bowers having a record of being outspoken in opposing discriminatory behavior.

70. The only explanation for approving a retaliatory corrective action containing knowingly false allegations is Gleason's support of and participation in said retaliation.

71. Fagin was also allowed to take away Peters' ability to hire apprentices – a direct responsibility for Peters' job function.

72. Within the remainder of the disciplinary action, Fagin failed to provide specific issues and reasons for such a write up and instead based her Written Corrective Action on baseless, personal biases against Peters, who at the time, was the only African American Associate Director of Coding withing the organization.

73. This was yet another deliberate attempt by Fagin and Banner Health to retaliate against Peters for reporting Fagin's racial discriminatory and retaliatory behavior.

74. On June 29, 2022, Peters sent formal documentation to Banner Health detailing the continued racial discrimination and retaliation she faced as an employee.

75. As matters progressed, Peters was being falsely accused of erratic behavior, yelling at her team, and not attempting team building.

76. Each time Fagin had a team meeting, she continued to hold Peters to different procedures and standards than the rest of her team who were Caucasian. There were no remedial actions being taken by Banner Health.

77. Late July 2022, Peters decided to meet with Matthew Small, Divisional HR Business Partner at Banner Health, to report the racial discrimination and retaliation. Hoping to escalate the matter to someone that would intervene.

78. During this meeting, Peters showed Small, text messages and a recording to provide details of what she had been going through.

79. Peters played a snippet of the July 12, 2022 recording and prefaced it by informing Smalls of the purpose of the meeting, which had been to discuss Fagin's continued attempt to single out Peters as not performing her duties correctly. Initially in August 2021, she required each team

member to disclose their preferred communication. Peters responded that her preferred communication methods were through Banner Heath Emails only and had communicated effectively and thoroughly with her team using Banner Health email.

80. Fagin did not have a preferred process.

81. During the June 12, 2022, meeting Fagin implemented a new way she wanted to be reached if a team member was going to be unavailable. During this time, Fagin cited the reason as accusing Peters of not communicating correctly thus far and prompting the need for a revamped communication procedure, one that disregarding company emails provided for the specific purpose of communicating with employees.

82. Fagin's accusations that Peters was yet again the issue among the team members, was just another attempt to discriminate and retaliate against her for reporting the racial discrimination she faced from Fagin.

83. Fagin had a pattern of being unresponsive to Peters, this was coupled with hostility and wholly fabricated discipline toward Peters. Peters was concerned that Fagin's refusal to be flexible and communicate with her in a manner that allowed matters to be clearly communicated and documented, would result in continued false allegations against her (e.g., allegations that Peters had failed to complete a task, respond to an inquiry, or get an approval or answer from Fagin when required).

84. Small did not take the time to investigate the issues presented to him by Peters and dismissed her concerns as insignificant.

85. Early August 2022, Peters was contacted by Garber who began interrogating Peters regarding the recording she showed to Small.

86. Garber shifted the issue from that of racial discrimination and retaliation, as recordings evidenced the treatment Peters was receiving from Fagin and turned the tables to falsely accuse Peters of violating HIPAA policies.

87. Peters vehemently denied the accusations that she recorded patient information for her records.

88. For months and months Banner Health refused to investigate Peters' claims, then when learning of recordings demonstrating the treatment Peters was receiving, Banner skewed the investigation toward the recordings, falsely claiming they contained Personal Health Information (PHI) in order to find *any* reason to terminate her employment. Instead of addressing unlawful discrimination and retaliation, Banner Health wanted Peters gone.

89. On August 18, 2022, Peters was forced to take FMLA leave due to the deterioration of her mental health, and increase in depression and anxiety, resulting from from the ongoing abuse, discrimination, and retaliation she endured.

90. Peters was approved to return to work by her psychiatrist, on November 10, 2022.

91. The same day Peters came back to work, Smalls requested a meeting with her.

92. Again, he accused Peters of violating HIPAA and Banner workforce confidentiality policies.

93. Banner Health claims that the very recording that Smalls heard from Peters contained PHI. However, a review of the recording clearly indicates there was no confidential patient information discussed.

94. The small snippet of the recording played for Smalls contained no basis for making any allegation that Peters was violating any policies. Any claims that there were resulting concerns regarding recordings held by Peters was mere pretext for unlawful discrimination and retaliation.

95. Even after Peters denied these accusations, she received a phone call from Gleason who stated she was being terminated for violation of confidentiality policies.

96. Banner Health terminated Peters because of her race, repeated complaints of race discrimination, opposition to discrimination, and engagement in protected activity.

97. Peters' termination was met with support and sympathy from peers and leadership outside of the corporate headquarters.

98. From August 2016 through August 8, 2021, Peters had an excellent performance record while under the management of Renee Blickenstaff (Caucasian). She had no write ups or corrective actions and her team outperformed all other outpatient teams. The only thing that changed was Fagin's promotion and with her new leadership role, Fagin's attitude toward Peters.

99. Banner Health's actions were designed not only to punish Peters, but also to have a chilling effect on others who might otherwise oppose discrimination or engage in protected activity.

100. Because of Banner Health's actions, Peters has suffered harms and damages. Financial damages include lost compensation.

101. Because of Banner Health's actions, Peters has suffered emotional damages including depression, anxiety, and sleeplessness/insomnia.

102. Because Banner Health's actions are intentional and made with a reckless disregard to Peters' federally protected rights, punitive damages should be imposed.

103. Banner Health's actions violated Title VII and 42 U.S.C. § 1981.

## IV. CAUSES OF ACTION

**A.  Race Discrimination in Violation of Title VII and 42 U.S.C. § 1981**

104. Plaintiff realleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

105. As described above, Defendant's actions constitute unlawful discrimination on the basis of Plaintiff's race in violation of Title VII and 42 U.S.C. § 1981.

106. The employment practices complained of above were intentional.

107. Plaintiff has satisfied all jurisdictional prerequisites in connection with her claims under Title VII and 42 U.S.C. § 1981.

108. As a result of Defendant's unlawful discrimination, Plaintiff has suffered and expects to suffer pecuniary losses, including but not limited to, lost wages and other benefits associated with her employment.

109. As a result of Defendant's discrimination, Plaintiff has suffered non-pecuniary losses including, but not limited to emotional pain, suffering, inconvenience, personal humiliation, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

110. Defendant acted at all relevant times with malice and/or reckless indifference to Plaintiff's federally protected rights. Plaintiff therefore seeks punitive damages under Title VII and 42 U.S.C. §§ 1981, 1981a.

111. Additionally, Plaintiff seeks any and all equitable relief necessary to return her to the position that she would have been in but for Defendant's unlawful discrimination.

112. Defendant's actions referenced in the above paragraphs have caused Plaintiff to retain the services of the undersigned counsel in order to pursue her federal rights in this action. Consequently, Plaintiff seeks attorneys' fees, expert costs, and other costs of suit under Title VII and 42 U.S.C. § 1981.

**B.     Retaliation in Violation of Title VII and 42 U.S.C. § 1981**

113. Plaintiff realleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

114. As described above, Defendant's actions constitute unlawful retaliation on the basis of Plaintiff's protected activity in violation of Title VII and 42 U.S.C. § 1981.

115. The employment practices complained of above were intentional.

116. Plaintiff has satisfied all jurisdictional prerequisites in connection with her claims under Title VII and 42 U.S.C. § 1981.

117. As a result of Defendant's unlawful retaliation, Plaintiff has suffered and expects to suffer pecuniary losses, including but not limited to, lost wages and other benefits associated with her employment.

118. As a result of Defendant's retaliation, Plaintiff has suffered non-pecuniary losses including, but not limited to emotional pain, suffering, inconvenience, personal humiliation, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

119. Defendant acted at all relevant times with malice and/or reckless indifference to Plaintiff's federal- and state-protected rights. Plaintiff therefore seeks punitive damages under Title VII and 42 U.S.C. §§ 1981 and 1981a.

120. Additionally, Plaintiff seeks any and all equitable relief necessary to return her to the position that she would have been in but for Defendant's unlawful retaliation.

121. Defendant's actions referenced above have caused Plaintiff to retain the services of the undersigned counsel in order to pursue her federal rights in this action. Consequently, Plaintiff seeks attorneys' fees, expert costs, and other costs of suit under Title VII and 42 U.S.C. § 1981

122. Plaintiff re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

## C. Harassment in Violation of Section 1981.

123. As described above, Defendant's actions constitute severe and pervasive harassment on the basis of Plaintiff's race, African American, in violation of 42 U.S.C. § 1981. The employment practices complained of above were intentional.

124. Plaintiff has satisfied all jurisdictional prerequisites in connection with his claims under § 1981.

125. As a result of Defendant's unlawful harassment, Plaintiff has suffered and expects to suffer pecuniary losses, including but not limited to lost wages and other benefits associated with his employment.

126. As a result of Defendant's Harassment, Plaintiff has suffered non-pecuniary losses including, but not limited to emotional pain, suffering, inconvenience, personal humiliation, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

127. Defendant acted at all relevant times with malice and/or reckless indifference to Plaintiff's federally protected rights. Plaintiff therefore seeks punitive damages under 42 U.S.C. §§ 1981 and 1981a.

128. Additionally, Plaintiff seeks any and all equitable relief necessary to return him to the position that he would have been in but for Defendant's unlawful discrimination.

129. Defendant's actions referenced above have caused Plaintiff to retain the services of the undersigned counsel in order to pursue his federal rights in this action. Consequently, Plaintiff seeks attorneys' fees, expert costs, and other costs of suit under 42 U.S.C. § 1981.

## V. JURY DEMAND

130. Plaintiff hereby demands a jury trial on all issues, claims, actions, and defenses against Defendant.

# VI. PRAYER

WHEREFORE, Plaintiff, respectfully requests that the above-named Defendant be cited to appear in this matter and that, after jury trial by proof, Plaintiff be awarded:

a. Judgment against Defendant ordering Defendant to take such other reasonable actions as may be necessary to remedy the effects of Defendant's violations of Title VII and 42 U.S.C. § 1981;

b. Judgment against Defendant for back pay;

c. Judgment against Defendant for front pay or reinstatement of employment to the position Plaintiff would enjoy if not for Defendant's unlawful actions;

d. Judgment against Defendant for compensatory damages including emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life;

e. Judgment against Defendant for punitive damages to the extent allowed under the law;

f. Pre-judgment interest at the appropriate legal rate on all amounts awarded;

g. Interest after judgment at the appropriate legal rate on all amounts awarded until paid in full;

h. Judgment against Defendant for Plaintiff's reasonable attorneys' and experts' fees;

i. Costs of suit; and

j. Such other and further relief to which Plaintiff may justly be entitled.

Respectfully submitted,

_____
Kalandra N. Wheeler* (Attorney-in-Charge)
Texas Bar No. 24051512
Southern Dist. Texas Bar No. 2944827
Robert J. Wiley*
Texas Bar No. 24013750
Southern Dist. Texas Bar No. 596499
*Board Certified in Labor and Employment Law by the Texas Board of Legal Specialization

WILEY WHEELER, P.C.
1651 Richmond Avenue
Houston, Texas 77006
Telephone: (713) 337-1333
Facsimile: (713) 337-1334
kwheeler@wiley-wheeler.com

ATTORNEYS FOR PLAINTIFF